IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 18-00085 SOM |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANT'S |
| | ) | EMERGENCY MOTION FOR |
| | ) | COMPASSIONATE RELEASE |
| | ) | |
| vs. | ) | |
| | ) | |
| JOSEPH KAMAKA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT'S EMERGENCY MOTION
FOR COMPASSIONATE RELEASE**

**I.      INTRODUCTION.**

In late 2019, Defendant Joesph Kamaka was sentenced to twelve months and a day in prison on one count of theft of public money in violation of 18 U.S.C. § 641.  He is scheduled to be released from USP Lompoc on December 3, 2020.  He now argues that, given the COVID-19 pandemic, this court should release him early under 18 U.S.C. § 3582(c)(1)(A) and, as a condition of his release, place him on home confinement for the duration of his sentence.  Kamaka, who is 49 years old, suffers from hypertension, which he says puts him at risk if he contracts the virus.  The circumstance that the court finds most critical here is the absence of evidence in the record establishing that officials at USP Lompoc are adequately protecting Kamaka.  To the contrary, USP Lompoc has a high rate of active COVID-19 infections, the dormitory setting in which Kamaka lives invites

the further spread of the coronavirus, and the Bureau of Prisons has failed to show that it is taking the steps necessary to protect vulnerable inmates like Kamaka.  This court finds that extraordinary and compelling circumstances justify Kamaka's release.

**II.        BACKGROUND.**

Kamaka entered a guilty plea to having violated 18 U.S.C. § 641.  Specifically, he admitted that, between 2011 and 2018, he received Social Security Disability Insurance payments from the Social Security Administration by falsely stating that he was too disabled to work.  In fact, during that time period, Kamaka was the Chief Executive Officer of No Ka Oi Guard Services, LLC.  He concealed his employment by having No Ka Oi pay his son, who then deposited the funds into Kamaka's bank account.  ECF No. 53.

This court sentenced Kamaka to twelve months and a day in prison.  He has been in custody at USP Lompoc in California since January 27, 2020, and, with anticipated "good time" credits, is scheduled to be released on December 3, 2020.  As of the date of this order, he has been in custody for a little less than four months.

Kamaka is 49 years old and suffers from hypertension, which he contends will increase his increase his risk of complications if he contracts COVID-19.  His original moving

papers, filed when he was proceeding *pro se*, also mentioned sleep apnea.  Although a supplemental memorandum filed after this court appointed the Federal Public Defender's Office to represent him did not raise sleep apnea as an issue, the court notes that sealed Exhibit G, ECF No. 50, Page ID # 317, confirms what Kamaka had asserted in that regard.

No one denies that the coronavirus is highly active at USP Lompoc.  Kamaka asks this court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and to reduce his sentence to time served.

**III.   ANALYSIS.**

Kamaka's compassionate release request is governed by 18 U.S.C. § 3582(c)(1)(A), which provides:

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission

In other words, for the court to exercise its authority under § 3582(c)(1)(A), it must (1) find that the defendant exhausted his administrative remedies or that 30 days have passed since he filed an administrative compassionate relief request; (2) also find, after considering the factors set forth in section 3553(a), that extraordinary and compelling reasons warrant a sentence reduction; and (3) find that such a reduction is consistent with the Sentencing Commission's policy statements.

As to exhaustion, on April 4, 2020, Kamaka submitted an administrative compassionate release request to the warden of his prison. ECF No. 45-5, PageID # 248. Because he filed this motion on May 8, 2020, more than 30 days after submitting his request to the warden, he has satisfied the time-lapse requirement of 18 U.S.C. § 3582(c)(1)(A). The Government is not contesting Kamaka's satisfaction of the exhaustion requirement.

This court therefore turns to § 3582(c)(1)(A)'s second requirement: whether extraordinary and compelling reasons warrant a sentence reduction. In enacting § 3582(c)(1)(A), Congress did not attempt to define "extraordinary and compelling." *United States v. Marks*, 2020 WL 1908911, at *4 (W.D.N.Y. Apr. 20, 2020). Congress did, however, direct the Sentencing Commission to promulgate general policy statements describing "what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of

specific examples." 28 U.S.C. § 994(t). Under § 3582(c)(1)(A)'s third requirement, a court's finding that extraordinary and compelling reasons justify compassionate release must be consistent with the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission has identified four categories of extraordinary and compelling reasons. According to the Sentencing Commission, a defendant should be granted compassionate release if (1) the defendant suffers from a terminal illness and certain other conditions are met; (2) the defendant suffers from a physical or mental condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover;" (3) certain family circumstances justify compassionate release; or (4) "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, [the first three categories of reasons]." U.S.S.G. § 1B1.13. The Sentencing Commission has also indicated that an inmate should not be released unless he or she "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.*

The Sentencing Commission's policy statements appear to be in need of updating. In 2018, Congress passed the First Step

Act, which amended § 3582(c)(1)(A) to allow defendants to bring motions seeking compassionate relief to the courts. First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018). Previously, only the Bureau of Prisons could ask the courts for such relief. The Sentencing Commission's policy statements do not reflect the courts' expanded authority. It appears that the Sentencing Commission has not had the opportunity to revise the policy statement in response to the First Step Act, because, since the passage of the First Step Act, the Sentencing Commission has only had two voting commissioners. *See, e.g.*, *United States v. Haynes*, 2020 WL 1941478, at *12 n.20 (E.D.N.Y. Apr. 22, 2020). The guidelines cannot be amended until two more voting commissioners are appointed to constitute a quorum. *Id.*

Nor is it obvious that courts remain bound by what the Sentencing Commission has so far announced, which is in considerable tension with the First Step Act. If read literally, the existing policy statement would only permit courts to determine whether an inmate fell into one of the three narrow categories of extraordinary and compelling circumstances identified by the Sentencing Commission. The fourth, "catch-all" provision only permits the *Director of the Bureau of Prisons* to determine whether other extraordinary and compelling reasons exist. The policy statement would therefore severely limit the authority conferred on the courts by the First Step Act.

6

Because of this tension, "courts are divided on whether they may disregard the stated deference to the Director of the Bureau of Prisons in determining what 'other reasons' would qualify as extraordinary and compelling." *Hirano v. United States*, 2020 WL 1861659, at *2 (D. Haw. Apr. 13, 2020). There appears to be a growing consensus that "U.S.S.G. § 1B1.13 as currently written would not constrain [a court's] ability to find extraordinary and compelling reasons warranting a sentence reduction[.]" *United States v. Vo.*, 2020 WL 2300101, at *2 (N.D. Cal. May 7, 2020); *see also, e.g.*, United *States v. Etzel*, 2020 WL 2096423, at *3 (D. Or. May 1, 2020) ("The Court is persuaded by the reasoning of numerous other district courts and holds that it is not constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction.").

Those decisions are persuasive to this court. Section 3582(c)(1)(A) states that a court's finding of extraordinary and compelling reasons must be consistent with the Sentencing Commission's guidance. Before Congress enacted the First Step Act, the Sentencing Commission determined that the BOP Director had wide discretion in determining whether extraordinary and compelling reasons existed. That guidance is consistent with a recognition that courts now can exercise the same discretion, as long as the court finds that a defendant is not a danger to the

7

safety of any other person or to the community.

This court finds that extraordinary and compelling reasons justify Kamaka's release to home confinement here. Kamaka's offense of conviction did not involve violence.[1] He has served less than half of his prison term, but he is scheduled to be released toward the end of this year. There is evidence in the record suggesting that, because of his hypertension, Kamaka is more likely to suffer complications if he contracts COVID-19. This court might not always find that a nonviolent individual in his 40s suffering from hypertension should be released early during a pandemic. But in this case those factors do not stand alone. What the record shows is that USP Lompoc has so far not demonstrated that it can protect its vulnerable inmates from COVID-19.

Kamaka is being held at USP Lompoc, which houses about 1707 individuals. That total includes 106 individuals in a satellite camp, and another 378 individuals in a different satellite camp that Kamaka is housed in. ECF No. 56, PageID # 368. Nearby is the sister FCI Lompoc, where more than 900 inmates have tested positive for COVID-19.[2] *See*

---

[1] The nonviolent nature of Kamaka's offense and the absence of other criminal history in his record suggest that he will not pose a danger to the safety of any other person or the community if he his released but confined to his home.

[2] According to the BOP's website, 884 of those inmates have "recovered" from COVID-19. https://www.bop.gov/coronavirus/.

https://www.bop.gov/coronavirus/. More than 150 inmates at USP Lompoc have tested positive; according to the BOP, 53 of those inmates have not yet recovered. *Id.* Moreover, it appears that the BOP has not organized mass testing of the inmates at USP Lompoc, so the true case count may be much higher. Tyler Hayden, *Lompoc Prison Explodes with Active COVID-19 Cases*, Santa Barbara Independent, May 13, 2020, *available at* https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/ (last visited May 28, 2020) ("Mass testing has not yet been organized for the other half, United States Penitentiary Lompoc (USP Lompoc)."); *see also* ECF No. 56, PageID # 364. Two USP Lompoc inmates have died of COVID-19. https://www.bop.gov/coronavirus/.

It is not clear how many of the 53 inmates at USP Lompoc who have not yet recovered are located in the satellite camps. This court asked the attorneys in this matter to file supplemental papers indicating how many of those inmates were at the camps, but the attorneys reported that they were unable to get a breakdown from the Bureau of Prisons. ECF No. 55, PageID # 357; ECF No. 56, PageID # 363. The absence of detail means that possibly all or most of the infected individuals could be at the camps. That might flow from the camps' communal dormitories that make social distancing impossible. Inmates reportedly live in large rooms with multiple beds less than 6 feet apart. They

9

share a few toilets and showers. If an inmate is infected but has not been identified as such and isolated, other inmates almost certainly will come into contact with him. Indeed, according to Kamaka, prison officials are not isolating individuals even after they show symptoms of having been infected with the coronavirus. ECF No. 56, PageID # 364. One sick inmate "[w]ent to medical on several occasions and was sent right back to the dorm" because prison officials claimed that "he wasn't taking his meds properly." *Id.* Kamaka also claims that prison guards are rotating between FCI Lompoc and the camp at USP Lompoc. *Id.* While the COVID-19 numbers posted at the Bureau of Prisons website indicate that FCI Lompoc has managed to reduce the number of inmates with active infections, FCI Lompoc had such a large number of infections earlier that it is not hard to imagine transmission from one Lompoc facility to another. Finally, in a letter submitted by Kamaka along with his reply brief, he indicated that although the prison staff have been given N95 masks, no masks are available for the inmates, who must fashion their own from available items like T-shirts. ECF No. 52-2, PageID # 353.

The Government has provided no information about protective measures taken at USP Lompoc. At most, in its opposition to Kamaka's motion, the Government submitted a declaration that described the precautions BOP officials are

taking generally. That declaration was signed by AnnElizabeth W. Card, an Associate Warden at *FDC Honolulu.* ECF No. 51-1, PageID # 330. Card may well speak for the BOP and may be communicating the national policy or overall actions taken by the BOP, but the absence of information specific to Lompoc is notable. This court attempted to fill that void by asking the attorneys to supplement the record with information about USP Lompoc. The response from the BOP was sparse. In response to this court's specific inquiry, it provided no information about whether prison staff rotated between the various Lompoc sections. ECF No. 55, PageID # 357.

Surely the BOP knows what, if anything, it is doing to protect inmates at USP Lompoc. It knows whether guards rotate among the various parts of Lompoc. It could probably figure out how many infected inmates came from the camps. While this court recognizes that BOP staff may well be overwhelmed by the effects of the pandemic within its facilities, an inquiry from a judge in the context of a particular inmate is probably unusual enough that this court could fairly expect an actual response. That that was not forthcoming is concerning and leaves open the possibility that not enough is being done at the camps at USP Lompoc.

This court is not overlooking certain factors that counsel against releasing Kamaka. For one thing, Kamaka is in

11

his 40s and has yet to serve even half of his prison term.  For another, Kamaka's purported concern about his health might be at odds with his decision to decline a regular flu shot in February 2020.  ECF No. 50, PageID # 317.  This court had asked Kamaka's counsel to provide the reason for that declination.  The court thought that the declination might have stemmed from a bad reaction to a previous flu shot, or that Kamaka might have actually had a flu shot shortly before his prison term began.  Those would have been reasonable reasons to decline a flu shot.  Unfortunately, what the court got in response to its request was a statement that Kamaka had declined a flu shot, something the court knew from the documents and sought a *reason* for, not a repetition of what the documents stated.  In short, like the BOP, Kamaka has not provided all the information this court requested.  Nevertheless, the court recognizes that, no matter the reason for the declination, declining a regular flu shot is declining a preventative measure for something far less deadly than the coronavirus, so the court does not consider the declination determinative here.  After considering what is in the record about conditions at USP Lompoc along with Kamaka's medical condition, the nonviolent nature of his crime, and the absence of other criminal history, this court finds that, on the record before it, extraordinary and compelling reasons justify Kamaka's release.

**V.       CONCLUSION.**

Kamaka's request for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is granted.  Kamaka's sentence is reduced to time served plus 15 days.  During that final 15-day period, the court recommends that Kamaka be quarantined to reduce the possibility that he might be infected and might transmit the virus, especially on the flight(s) to his home in Hawaii.  The quarantine should not be in a communal setting; if possible, Kamaka should be moved to an individual cell at USP Lompoc during the final 15 days.  The court seeks to avoid having him placed in a group of quarantined inmates because that could cause the quarantine "clock" to restart every time one of them tests positive for COVID-19, leading to an endless quarantine.

Effective as soon as he arrives at his final destination and as a condition of his three-year period of supervised release, Kamaka shall be placed on home confinement through December 3, 2020.

Kamaka shall abide by all of the standard, mandatory, and special conditions of supervised release previously imposed, as well as the following additional special conditions:

8.  You will be monitored by a virtual supervision application through December 3, 2020, and you must follow the rules and regulations of the location monitoring program, pursuant to the Participant's Agreement. You are restricted to your residence at all times except for employment; religious services; medical necessities; court appearances; or other activities specifically approved by the court. You must pay the costs of the program, as directed by the probation officer.

9. You must own a smartphone through December 3, 2020, and agree to maintain a data plan on the aforementioned device. You must download a virtual supervision application to this smartphone that will allow U.S. Probation to use the application for purposes of your supervision, including periodic access to location data, captured during supervision-related events. You understand that text conversations through use of this application will be retained for supervision purposes.

Kamaka shall be released after the 15-day period from BOP custody to begin his term of supervised release, which shall include the above-defined home confinement. As part of that home confinement, he shall remain in self-quarantine for a period of not less than 14 days after arrival at the place he will live following release. Quite apart from the home confinement condition, this is required by the State of Hawaii for all individuals arriving from out-of-state on flights to Hawaii.

Kamaka is ordered to report by telephone (808 541 1283) to the United States Probation Office, District of Hawaii, within 72 hours of his release from BOP custody.

It is so ordered.

DATED: Honolulu, Hawaii, May 29, 2020.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Kamaka*, Cr. No. 18-00085 SOM; ORDER GRANTING DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE